IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No. 17-273 |
| ) | |
| DEVON DIXON ) | |

**GOVERNMENT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

AND NOW comes the United States of America, by its attorneys, Scott W. Brady, United States Attorney for the Western District of Pennsylvania, and Nicole Vasquez Schmitt, Assistant United States Attorney for said District, and respectfully submits its Proposed Findings of Fact and Conclusions of Law regarding the Defendant's Motion to Suppress Evidence (Doc. No. 51).

## I. FINDINGS OF FACT

### A. Procedural History

1. The Defendant was indicted by a federal grand jury on October 10, 2017 of (1) distribution of heroin and fentanyl resulting in serious bodily injury, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); (2) possession with intent to distribute heroin and fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); (3) possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1); and (4) possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i).

2. The Defendant moved to suppress evidence seized and statements made by the Defendant following a traffic stop that occurred on October 20, 2016. (Doc. No. 51.)

3. A hearing was held on the Defendant's motion on September 18, 2019.

### B. October 20, 2016 Stop

4. James Caterino, a Munhall and Braddock Detective, a task force officer ("TFO") with the FBI's Western P.A. Opiate Task Force, and a patrolman in West Homestead, testified at the hearing. (September 18, 2019 Hearing Transcript ("Tr."), at 8.)

5. He explained that, prior to October 20, 2016, he knew Defendant Devon Dixon by the street name "Streets" through previous investigations in Braddock. (Tr. 9.)

6. TFO Caterino knew that the Defendant was from Braddock and that he utilized a tannish-gold color Chevy Impala; he had seen the Defendant driving it numerous times in Braddock, Swissvale, and Homestead. (Tr. 9-10.)

7. The car is registered to Andre Dixon, the Defendant's father. (Tr. 10.)

8. TFO Caterino was able to observe the Defendant driving the car on these occasions even with tinted windows because he saw the Defendant through the windshield or with the window down. (Tr. 10.)

9. On October 20, 2016, TFO Caterino was investigating a non-fatal overdose; the victim had injected and/or snorted heroin/fentanyl and had overdosed. (Tr. 10-11.)

10. Fellow Task Force Officer Lee Niebel, who also testified at the hearing, went to McKeesport Hospital to make contact with the victim. (Tr. 11.)

11. The victim told TFO Niebel that he purchased narcotics from an individual named "Streets" and overdosed on the drugs. (Tr. 31.)

12. TFO Caterino learned from TFO Niebel that the person who delivered the substance to the victim was a male by the name of "Streets." (Tr. 11.)

13. TFO Caterino believed it was the Defendant based on his past knowledge of the Defendant and the area in which the overdose occurred. (Tr. 11-12.)

14. The victim was released from the hospital after TFO Niebel had left the hospital; TFO Niebel located him a few blocks from the hospital at the Shop N' Save in McKeesport. (Tr. 31-32.)

15. Later that day, the victim was in TFO Caterino's vehicle, and the victim instructed TFO Caterino where to drive to the area where the delivery transpired. (Tr. 12.)

16. Once they were in the area, the victim saw the Chevy Impala (which was stopped at the time) and recognized the vehicle. (Tr. 12-13; 22.)

17. TFO Caterino also immediately recognized the vehicle. (Tr. 13.)

18. The victim said "That's him right there," referring to the person who sold him the drugs. (Tr. 21-22.)

19. The windows were tinted and you could not see through them. (Tr. 13.) TFO Caterino testified that this tinting, or "sunscreening," is illegal in Pennsylvania. (Tr. 13.)

20. TFO Caterino followed the vehicle and notified the Braddock Police Department to stop the vehicle to identify the driver in the ongoing overdose investigation. (Tr. 13-14.)

21. The vehicle stop ultimately took place on the Rankin Bridge, and was conducted by the Braddock, North Braddock, Rankin, and Whitaker police departments. (Tr. 14.)

22. TFO Caterino drove by as the stop was occurring and positioned his car in a nearby gas station that was about 50 yards away. (Tr. 14-15; 23-24.)

23. TFO Caterino was in contact with the stopping officers on the radio before the individuals were taken out of the car. (Tr. 15.)

24. TFO Caterino could see the individuals when they were taken out of the car through binoculars, and he recognized the driver as the Defendant and the passenger as Rondell Prysock (whom TFO Caterino also knew from previous investigations and encounters in the Braddock area). (Tr. 15-16; 24.)

25. The victim, who was given the binoculars, positively identified the driver as "Streets," and stated that was the person who had provided him with illegal narcotics. (Tr. 15; 24.)

26. The Defendant and Mr. Prysock gave fake names to the stopping officers, which TFO Caterino learned through radio contact. (Tr. 16; 24.)

27. TFO Caterino ran an NCIC warrant check on both of them, and they came back as wanted; TFO Caterino conveyed that to the officers conducting the traffic stop. (Tr. 16; 24-25.)

28. The Defendant was wanted for a probation violation. (Tr. 16.)

29. TFO Caterino explained that when there is an active warrant and someone is stopped at the scene, he would have to take him to jail regardless of the ongoing investigation. (Tr. 16.)

30. TFO Caterino also explained that the false identification given to law enforcement by the Defendant was an arrestable offense. (Tr. 17.)

31. The Defendant was transported to the Munhall Police Department. (Tr. 17.)

32. The vehicle was towed because neither the driver nor the passenger had a valid driver's license; they were both under arrest; there was no one to whom the car could have been released; the vehicle was on the bridge around 5:00 p.m.; and there was a lot of traffic. (Tr. 17-18; 26.)

33. Even if someone could have come to retrieve the car, TFO Caterino explained that he would not have released it because he believed that possible narcotics could be found in the car due to the ongoing overdose investigation. (Tr. 18.)

**C.     October 20, 2016 Search of Car**

34. TFO Niebel joined the scene on the Rankin Bridge during the stop; the occupants were already out of the car. (Tr. 33.)

35. TFO Niebel approached the car and when he looked inside, he noticed a pry mark on the headlight on and off switch compartment, which is on the dashboard to the left of the steering wheel. (Tr. 34; 38.)

36. TFO Niebel testified that it looked like someone used a knife or sharp object to wedge between the black of the compartment and the tan of the dashboard. (Tr. 39.)

37. This is a known spot for drug dealers to hide drugs, money, and weapons. (Tr. 34.)

38. TFO Niebel explained that he was conducting an overdose resulting in serious bodily injury investigation and was looking for drugs, cell phones, currency, and anything related to an overdose. (Tr. 34.)

39. While he was still on the bridge, TFO Niebel pulled open the dashboard compartment where he had observed the pry mark and saw a firearm and a package of narcotics. (Tr. 34-35; 45.)

40. The compartment was not deep; the items were visible without TFO Niebel inserting his hand into the compartment. (Tr. 35.)

41. TFO Niebel then put the compartment back in place. (Tr. 46.)

42. TFO Niebel closed and secured the vehicle because he did not want to remove evidence on the bridge. (Tr. 35.)

43. The car was towed. (Tr. 35.)

44. TFO Niebel contacted AUSA Craig Haller, who gave the go-ahead to search the vehicle without a warrant based on the totality of the circumstances. (Tr. 36.)

45. TFO Niebel then photographed and searched the vehicle at the Munhall Police Department. (Tr. 36.)

## II. CONCLUSIONS OF LAW

The Defendant argues that (1) the original traffic stop was conducted in the absence of probable cause; (2) the search behind the dashboard was not within the scope of the Inventory Exception; and (3) the Defendant's statements made during a custodial interrogation following his arrest after the traffic stop were fruit of the poisonous tree. (Doc. No. 51.) For the reasons explained below, the Defendant is wrong on each account.

### A. The Stop and Search of the Vehicle Was Lawful.

Law enforcement officers may make an investigative stop of a vehicle upon "reasonable suspicion" of wrongdoing. *United States v. Elmore*, 548 F. App'x 832, 836-37 (3d Cir. 2013) (citing *United States v. Hensley,* 469 U.S. 221, 226 (1985)). Following a valid traffic stop, "'[p]olice have probable cause to arrest if the circumstances are sufficient to cause a prudent person to believe that a crime has been committed and the person to be arrested committed it.'" *Id.* (quoting *United States v. Stubbs*, 281 F.3d 109, 122 (3d Cir. 2002)). Probable cause and reasonable suspicion are both to be evaluated based upon the "totality of the circumstances." *United States v. Arvizu*, 534 U.S. 266, 275 (2002); *Illinois v. Gates*, 462 U.S. 213, 230-31 (1983). Officers are permitted to draw from "their own experience and specialized training to make inferences from and deductions about the cumulative information available." *Arvizu*, 534 U.S. at 273. Under the collective knowledge doctrine, information known to any one officer is imputed to the other officers in a joint operation. *United States v. Ray*, 704 F. App'x 132, 135 (3d Cir. 2017) (citing

5

*United States v. Belle*, 593 F.2d 487, 497 n.15 (3d Cir. 1979)).

In *Elmore*, the Third Circuit Court of Appeals found that the totality of the circumstances gave the arresting officers both reasonable suspicion to make the investigative stop of the vehicle and probable cause to effectuate the warrantless arrest of the operator of the vehicle where the stop of the vehicle was based on a description provided by a reliable eyewitness. *Elmore*, 548 F. App'x at 836-37; *see also Ray*, 704 F. App'x at 135-36 ("The District Court found several reasons that established probable cause to arrest Ray for attempted delivery of a controlled substance: the information from Bobb that 'Diego' was trafficking controlled substances; the confirmation of 'Diego's' identity through law enforcement networks and databases; Bobb's physical identification of 'Diego' as Ray; the multiple conversations that Bobb had with 'Diego' about the transaction and past transactions; and the surveillance of the Burger King.").

The *Elmore* court explained that, in assessing the reliability of an informant's tip, courts look to factors including whether: "'(1) the information was provided to the police in a face-to-face interaction, allowing an officer to assess directly the informant's credibility; (2) the informant can be held responsible if her allegations are untrue; (3) the information would not be available to the ordinary observer; (4) the informant has recently witnessed the criminal activity at issue; and (5) the witness's information accurately predicts future activity.'" *Elmore*, 548 F. App'x at 836-37 (quoting *United States v. Johnson*, 592 F.3d 442, 449 (3d Cir. 2010)). The Third Circuit Court of Appeals has also held that that there is probable cause to arrest an individual where it is "evident that [he] was involved in a drug transaction." *United States v. Burton,* 288 F.3d 91, 99 (3d Cir. 2002).

Where there is probable cause to arrest the operator of a vehicle, the officers may also immediately search the vehicle when it is reasonable to believe evidence relevant to the crime of the arrest might be found in the vehicle. *Elmore*, 548 F. App'x at 836-37 (citing *Arizona v. Gant,* 556 U.S. 332, 343 (2009); *see also Ray*, 704 F. App'x at 136 ("The probable cause to arrest Ray also supported the search of the vehicle."). Moreover, the automobile exception permits police to search and seize a vehicle so long as they have probable cause to believe that the vehicle contains contraband or evidence of a crime. *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996); *see also* cases cited in the Government's Omnibus Response in Opposition to Defendant's Motions (Doc. No. 53). If circumstances "indicate[ ] a fair probability" of finding contraband, there is probable cause." *United States v. McMillan*, 774 F. App'x 768, 770–71 (3d Cir. 2019).

The Supreme Court has repeatedly held that the automobile exception does not evaporate once the vehicle has been taken away from the place of the initial stop to the police station. *United States v. Thompson*, 545 F. App'x 167, 170-71 (3d Cir. 2013). "'[P]olice officers with probable cause to search an automobile at the scene where it was stopped [can] constitutionally do so later at the station house without first obtaining a warrant . . . . [T]he probable-cause factor that developed at the scene still obtain[s] at the station house.'" *Id.* (quoting *Texas v. White,* 423 U.S. 67, 68 (1975) and citing *California v. Acevedo*, 500 U.S. 565, 570 (1991)). As the Third Circuit explained in *Thompson*, "[f]or the same reasons the DBPD had probable cause to stop the vehicle, they had probable cause to search it. T.W.'s tip validly led the police to believe that there was a 'fair probability that contraband or evidence of a crime' was to be found in the van's side panel. Lieutenant Gibney made the decision that rather than search the van in the middle of the street while a crowd grew, it was more prudent to conduct the search at the police station. The automobile exception permitted the police the same latitude to conduct the search without a

7

warrant back at the station as it did at the place of the stop." *Id.*

Also, importantly, "[i]f probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *United States v. Ross*, 456 U.S. 798, 825 (1982). Indeed, Courts in this district have held that "evidence of a hidden compartment within a suspect's automobile can contribute to, and, under appropriate circumstances, may even single-handedly establish, a finding of probable cause." *United States v. Meran*, No. CR 16-222, 2017 WL 4803927, at *18 (W.D. Pa. Oct. 23, 2017) (internal quotation marks omitted).

Here, the totality of the circumstances gave the officers reasonable suspicion and probable cause to stop the vehicle, probable cause to arrest the Defendant, and probable cause to search the vehicle. As the testimony established at the hearing, the victim provided information to TFO Niebel in a face-to-face interaction at the hospital after purchasing narcotics directly from "Streets" and suffering an overdose. (Tr. 11; 31.) After learning that the victim had identified "Streets" as the person who sold the drugs, TFO Caterino believed it was the Defendant based on his past knowledge of the Defendant. (Tr. 11-12.) After being released from the hospital, the victim directed TFO Caterino where to drive to the area where he purchased the drugs. (Tr. 12; 31-32.) The victim's location information accurately predicted future events because they saw the Defendant's car, which the victim and TFO Caterino both independently recognized. (Tr. 12-13; 21-22.) TFO Caterino also observed a traffic violation related to window tinting. (Tr. 13.) During the stop, the victim saw the Defendant and positively identified him as "Streets," who had sold him the drugs. (Tr. 14-16; 24.) TFO Caterino also recognized the Defendant. (*Id.*) In addition, after giving a fake name, which is cause for arrest, officers learned that the Defendant was wanted for a probation violation. (Tr. 16; 24-25.) Then, TFO Niebel noticed a pry mark on a vehicle

compartment that is a known spot for drug dealers to hide drugs, money and weapons. (Tr. 34-35; 38-39; 45.) The car was then towed, and fully searched and photographed at the police department. (Tr. 35-36.) Under the cases and well-established principles discussed above, the actions of the officers were lawful and did not violate the Defendant's Fourth Amendment rights.

### B. The Defendant's Statements Were Not Fruit of the Poisonous Tree.

The Defendant also argues that any statements he made were a by-product of the illegal stop and search of the car. The Defendant does not move to suppress his statements on any other grounds. As explained above, the stop was not illegal and thus this portion of the motion to suppress should be denied. Even if the stop was illegal, however, the Defendant's statements to police should still not be suppressed. The Defendant was arrested on another outstanding warrant and would have been in custody regardless of any search of the Impala. Further, there was independent probable cause to arrest the Defendant as he had been identified as the distributor of narcotics in a non-fatal overdose prior to the stop or search of his vehicle. Accordingly, any statements he made to investigators should be admitted. *See Utah v. Strieff*, 136 S. Ct. 2056, 2061-63 (2016) (holding that discovery of valid, pre-existing arrest warrant attenuates connection between unlawful investigatory stop and drug-related evidence seized from defendant during search incident to arrest and explaining that there are several exceptions to the exclusionary rule: "First, the independent source doctrine allows trial courts to admit evidence obtained in an unlawful search if officers independently acquired it from a separate, independent source. Second, the inevitable discovery doctrine allows for the admission of evidence that would have been discovered even without the unconstitutional source. Third . . . is the attenuation doctrine: Evidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that the interest

protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.") (internal quotations and citations omitted).

## III. CONCLUSION

For the foregoing reasons, the Court should deny the Defendant's motion to suppress.

Respectfully submitted,

SCOTT W. BRADY
United States Attorney

*/s/ Nicole Vasquez Schmitt*
NICOLE VASQUEZ SCHMITT
Assistant U.S. Attorney
Joseph F. Weis, Jr. U.S. Courthouse
700 Grant Street, Suite 4000
Pittsburgh, Pennsylvania 15219
412-894-7513 (Phone)
412-894-7311 (Fax)
Nicole.Vasquez.Schmitt@usdoj.gov
PA ID No. 320316