IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Criminal No. 17-273 |
| | ) Judge Nora Barry Fischer |
| DEVON DIXON, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION**

**I.     Introduction**

Presently before the Court is a Motion to Suppress Evidence (Docket No. 51) filed by Defendant Devon Dixon ("Defendant"). The Government filed its Response in opposition thereto, and the Court held a motion hearing on September 18, 2019, the official transcript of which was filed of record. (Docket Nos. 53, 59, 61). At the Court's direction, the parties submitted post-hearing proposed findings of fact and conclusions of law on December 18, 2019, (Docket Nos. 64, 65), and responses to same on January 17, 2020. (Docket Nos. 66, 67). At Defendant's request, the Court then held oral argument on February 26, 2020, and the official transcript of that proceeding was filed on March 26, 2020. (Docket Nos. 69, 73). The parties declined to file any additional supplemental briefing. After careful consideration of all of the parties' submissions, the transcripts of the proceedings and the credible evidence of record, and for the following reasons, Defendant's Motion to Suppress is denied.

II.     **Background**

A.  **Procedural History**

On October 10, 2017, Defendant was charged in a four-count Indictment with the following: distribution of heroin and fentanyl resulting in serious bodily injury, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); possession with intent to distribute heroin and fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1); and possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i), all for conduct occurring on or about October 20, 2016.  (Docket No. 1).  Following Defendant's apprehension pursuant to an arrest warrant, he was arraigned and pled not guilty to the charges on May 8, 2018.  (Docket No. 18).

Defendant subsequently requested and was granted numerous extensions of time to file pretrial motions.  On June 28, 2019, Defendant filed the Motion to Suppress Evidence and a Motion to Produce Evidence which the Government Intends to Use Under Federal Rules of Evidence 404(b) and 609.[1]  (Docket Nos. 51, 52).  The Government filed an Omnibus Response to Defendant's Motions on July 15, 2019.  (Docket No. 53).  As stated, the Court held hearing and oral argument on Defendant's Motion to Suppress, all supplemental briefing is complete and the matter is now ripe for disposition.

---

[1]     Defendant's motion for disclosure of Rule 404(b) evidence will be denied as premature and without prejudice, as the Court will set a deadline for disclosure of Rule 404(b) material in the Pretrial Order.  Defendant's request for disclosure of Rule 609 evidence will be denied as moot, as the Government has provided notice that it will attempt to impeach Defendant with a 2015 conviction for felony eluding and a 2015 felony drug conviction if he testifies at trial.  (Docket No. 53 at 3).

B. <u>Facts</u>[2]

As discussed in more detail below, at issue here is whether the stop and search of the vehicle driven by Defendant was lawful and whether any statements he made to law enforcement following his arrest were fruit of the poisonous tree. At the suppression hearing, the Government entered into evidence a series of 14 color photographs depicting a tannish-gold automobile, a portion of the dashboard area, a firearm and a plastic baggie containing a white substance. (Docket No. 59-2). The Government also called Borough of Munhall Detective James Caterino and Task Force Officer ("TFO") Lee Niebel, who testified concerning the events bearing on the matters at issue and were subject to cross-examination concerning same.

In this Court's estimation, based on their demeanor and testimony in response to the questioning of the attorneys and the Court at the suppression hearing, Detective Caterino and TFO Niebel offered credible testimony concerning their versions of the events that unfolded on the date in question, despite the defense's efforts to impeach them. *See United States v. Garcia*, 521 F. App'x 71, 73 (3d Cir. 2013) (quoting *Anderson v. City of Bessemer,* 470 U.S. 564, 575 (1985)) ("'[w]hen findings are based on determinations regarding the credibility of witnesses ... for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said.'"). In addition, both Detective Caterino and TFO Niebel presented as experienced officers. In that regard, Detective Caterino testified that he has been a police officer for 15 years and he is currently employed as a Detective in Munhall and Braddock and as a patrolman in West Homestead. (Docket No. 61 at

---

[2]  At a hearing on a motion to suppress, it is well-settled that "the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." *United States v. Richardson*, 501 F. Supp. 2d 724, 734 (W.D. Pa. 2007) (citations omitted).

8, 27).  He has also worked cases with the FBI since 2008 and has been assigned full-time to the FBI's Western Pennsylvania opiate task force for three years.  (*Id.*).  TFO Niebel testified that he has been a police officer since 2008.  (*Id.* at 29).  He has been employed as a police officer with the Port Authority of Allegheny County Police Department since 2011, and he is assigned to the FBI's opioid task force.  (*Id.*).

Turning to the testimony adduced at the suppression hearing, both Detective Caterino and TFO Niebel were involved in an investigation of Defendant on October 20, 2016.  (Docket No. 61 at 9, 30-31).  Detective Caterino testified that he knew Defendant went by the name "Streets" through previous investigations in the Braddock area, where Defendant resided.  (*Id.* at 9, 19).  Detective Caterino also knew that Defendant utilized a tannish-gold Chevy Impala (which was registered to Defendant's father, Andre Dixon) because he had seen Defendant driving it numerous times in Braddock, Swissvale and Homestead.  (*Id.* at 9-10).  Detective Caterino explained that the Chevy Impala had tinted windows on both sides of the vehicle and the rear windshield, but he was able to see Defendant through the front windshield or with the driver's window rolled down and when he exited the vehicle.  (*Id.* at 10, 20-21).

As to the events of October 20, 2016, Detective Caterino began investigating a non-fatal drug overdose after learning from the North Braddock Police Department that the victim ingested heroin/fentanyl, was unconscious and was administered Narcan to be revived.  (Docket No. 61 at 10-11).  The victim was transported to McKeesport Hospital where TFO Niebel met with him.  (*Id.* at 11, 31, 40).  TFO Niebel testified that the victim seemed alert and competent when they spoke.  (*Id.* at 50).  The victim told TFO Niebel that he overdosed on drugs which he purchased from an individual named "Streets."  (*Id.* at 31, 42).  TFO Niebel relayed this information to Detective Caterino, who believed "Streets" was Defendant based on his past knowledge of

Defendant and the area where the overdose occurred. (*Id.* at 11-12).

TFO Niebel left the hospital because it appeared that the victim was going to be admitted for treatment. (Docket No. 61 at 31). When word was received that the victim was released, TFO Niebel returned and located him a few blocks away in the parking lot of a grocery store in McKeesport. (*Id.* at 31-32, 40-41). At that point, the victim went with Detective Caterino in his vehicle, along with Agent Leonard Piccini. (*Id.* at 32).

Detective Caterino testified that he and Agent Piccini drove with the victim to the area where the drug transaction had transpired based on the victim's description of that location. (Docket No. 61 at 12). When they arrived at the location, the victim saw the Chevy Impala, which was stopped at the time, and stated "[t]hat's him right there," referring to the person who sold him the drugs. (*Id.* at 12-13, 21-22). Detective Caterino also immediately recognized the vehicle and noted that the vehicle's windows were tinted and not possible to clearly see through, which is illegal in Pennsylvania. (*Id.* at 13).

When the Chevy Impala began to move, Detective Caterino followed the vehicle and notified the Braddock Police Department to attempt to stop it and to identify the driver given the ongoing drug overdose investigation. (Docket No. 61 at 13-14, 22-23). The Braddock, North Braddock, Rankin and Whitaker Police Departments responded and assisted in stopping the Chevy Impala on the Whitaker side of the Rankin Bridge. (*Id.* at 14). Detective Caterino drove by the scene, positioned his vehicle at a gas station approximately 50 yards away and remained in radio contact with the officers who conducted the stop. (*Id.* at 14-15). When the individuals were removed from the vehicle, Detective Caterino, using binoculars, immediately recognized Defendant as the driver and Rondelle Prysock as the passenger. (*Id.* at 15, 24). The victim, also using binoculars, identified Defendant as "Streets," who had provided him with drugs. (*Id.*).

Through radio contact with officers who conducted the stop, Detective Caterino knew that Defendant and Prysock had provided incorrect names because he was familiar with them through prior investigations in the Braddock area. (Docket No. 61 at 9, 15-16). Detective Caterino ran a check of both individuals through NCIC, learned that Defendant was wanted on a probation violation warrant and relayed that information to the officers who conducted the vehicle stop. (*Id.* at 16, 24-25). As Detective Caterino explained, when there is an active warrant for an individual who is stopped, the police have to take the individual to jail regardless of any other investigation. (*Id.* at 16). Additionally, Detective Caterino testified that Defendant could have been arrested for providing false identification to law enforcement. (*Id.* at 17).

When TFO Niebel arrived at the scene of the traffic stop, Defendant and Prysock were already out of the vehicle and both the driver and passenger doors were open. (Docket No. 61 at 33, 44). TFO Niebel looked inside and noticed pry marks on the headlight on and off switch compartment to the left of the steering wheel on the dashboard (the "dashboard compartment"). (*Id.* at 33-34, 38, 45). TFO Niebel described the pry marks as "scratched . . . it's a white mark where it should be black." (*Id.* at 39). TFO Niebel indicated that the area he was referring to with pry marks "would have been depressed, meaning not flush with the dashboard" and agreed on cross-examination that the photographs depicting same were not three-dimensional and thus did not show such depth. (*Id.* at 39). However, TFO Niebel explained that it appeared someone used a knife or sharp object to wedge between the dashboard compartment and the surrounding area. (*Id.*).

TFO Niebel testified that the pry marks caught his attention because, based on his training and experience, that area is a void in the dashboard which is approximately an arm's length deep and is a known spot for drug dealers to hide drugs, weapons and money. (Docket No. 61 at 34).

TFO Niebel's investigation of the drug overdose and observation of pry marks on the dashboard compartment led him to believe that drugs were likely stored inside of the compartment. (*Id.* at 34-35). To that end, TFO Niebel opened the dashboard compartment and saw a firearm and package of narcotics, but he did not touch the items because he did not want to remove evidence while the vehicle was on the bridge in traffic. (*Id.* at 35, 45). Therefore, he closed the dashboard compartment, secured the vehicle and planned to have it towed. (*Id.* at 35).

After that, Defendant was transported to the Munhall Police Department. (Docket No. 61 at 17). As Detective Caterino explained, the vehicle was also towed there, given that Defendant did not have a valid driver's license, he was under arrest, there was no one to whom the car could have been released, and it was believed that drugs likely could be found in the car in connection with the overdose investigation. (*Id.* at 17-18, 26). TFO Niebel travelled to the Munhall Police Department, contacted AUSA Craig Haller, informed him about the investigation, the vehicle stop and his observations of the vehicle, and AUSA Haller gave the go-ahead to search the vehicle without a warrant. (*Id.* at 36, 46). TFO Niebel then photographed and searched the vehicle, which included removing the dashboard compartment wherein he located a firearm, heroin and crack cocaine. (*Id.* at 36, 47, 48-50).

**III.    Motion to Suppress Evidence**

Defendant argues that evidence seized following the traffic stop and his statements to law enforcement were obtained in violation of the Fourth Amendment and should be suppressed for the following reasons: (1) the traffic stop was conducted without probable cause that a moving violation had occurred and without contemporaneous knowledge that an occupant of the vehicle was the subject of an outstanding arrest warrant; (2) even if the traffic stop was justified, Defendant's Fourth Amendment rights were violated because the warrantless search and seizure

of items located in the dashboard compartment were outside the scope of the inventory exception to the warrant requirement;[3] and (3) Defendant's statements to law enforcement during a custodial interrogation following his arrest were "fruit of the poisonous tree." (*See* Docket Nos. 51, ¶¶ 12-18; 65; 66).

The Government counters that there was reasonable suspicion and probable cause to stop the vehicle, probable cause to arrest Defendant and probable cause to search the vehicle, including all compartments. (*See* Docket Nos. 53; 64; 67). Additionally, any statements Defendant made to law enforcement following his arrest were not fruit of any illegal search. (*See id.*). For reasons that follow, the Court agrees and finds that law enforcement lawfully stopped and searched the vehicle Defendant was driving and lawfully arrested him, thus any evidence seized is admissible at trial in this case. Given that no Fourth Amendment violation occurred, Defendant's subsequent statements to law enforcement are also admissible.

## A. Law Enforcement Lawfully Stopped the Vehicle Defendant Was Driving

"As a general rule, the burden of proof is on the defendant who seeks to suppress evidence. However, once the defendant has established a basis for his motion . . . the burden shifts to the government." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995) (citations omitted). Here, it is undisputed that the police stopped the vehicle Defendant was driving and subsequently searched it without a warrant. Therefore, the burden shifts to the Government to show that the vehicle stop and search were reasonable. On both counts, the Court finds that the Government sustained its burden.

Law enforcement officers may make an investigative stop of a vehicle based upon

---

3   At the suppression hearing, the Assistant United States Attorney clarified that the Government is not relying on any argument related to an inventory search of the vehicle. (Docket No. 61 at 4). As discussed herein, the Government contends that the vehicle search was lawful under the automobile exception to the warrant requirement, which Defendant disputes. (Docket Nos. 53 at 7; 64 at 7-8; 65, ¶ 30).

"reasonable suspicion" of wrongdoing. *United States v. Elmore*, 548 F. App'x 832, 836 (3d Cir. 2013) (citing *United States v. Hensley*, 469 U.S. 221, 226 (1985)). Although a "mere 'hunch'" does not create reasonable suspicion, the level of suspicion required "is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Kansas v. Glover*, ___ S.Ct. ___, 2020 WL 1668283, at *3 (Apr. 6, 2020) (quoting *Navarette v. California*, 572 U.S. 393, 397 (2014)). Because reasonable suspicion is a "less demanding" standard, it "can be established with information that is different in quantity or content than that required to establish probable cause." *Glover*, 2020 WL 1668283, at *3 (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)).

Following a lawful traffic stop, "a warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004); *United States v. Stubbs*, 281 F.3d 109, 122 (3d Cir. 2002) ("Police have probable cause to arrest if the circumstances are sufficient to cause a prudent person to believe that a crime has been committed and the person to be arrested committed it.").

Reasonable suspicion and probable cause are both to be evaluated based upon the "totality of the circumstances." *United States v. Arvizu*, 534 U.S. 266, 275 (2002); *Illinois v. Gates*, 462 U.S. 213, 230-31 (1983). In making this assessment, officers are permitted to "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available." *Arvizu*, 534 U.S. at 273. "Under the collective knowledge doctrine, information known to any one officer is imputed to the other officers in a joint operation." *United States v. Ray*, 704 F. App'x 132, 135 (3d Cir. 2017) (citing *United States v. Belle*, 593 F.2d 487, 497 n.15 (3d Cir. 1979)). Considering the totality of the circumstances in

this case, the Court easily concludes that law enforcement officers had reasonable suspicion to stop the vehicle Defendant was driving and probable cause to effectuate his arrest.

As discussed, Detective Caterino investigated a non-fatal drug overdose on October 20, 2016, after learning from the North Braddock Police Department that the victim ingested heroin/fentanyl and was transported to McKeesport Hospital. (Docket No. 61 at 10-11). TFO Niebel went to the hospital and met with the victim, who explained that he overdosed on drugs which he had purchased from "Streets." (*Id.* at 31, 40, 42). TFO Niebel relayed this information to Detective Caterino, who believed "Streets" was Defendant based on his past knowledge of Defendant[4] and the area where the overdose occurred. (*Id.* at 11-12). *See United States v. Johnson*, 592 F.3d 442, 450 (3d Cir. 2010) (citing *White*, 496 U.S. at 329-31) ("The reliability of an informant's tip can be enhanced further by independent police corroboration of the information provided.").

The victim's tip that "Streets" sold him the drugs proved to be reliable as judged by the factors courts are to consider in assessing the reliability of an informant's tip, including whether:

> (1) the information was provided to the police in a face-to-face interaction, allowing an officer to assess directly the informant's credibility; (2) the informant can be held responsible if her allegations are untrue; (3) the information would not be available to the ordinary observer; (4) the informant has recently witnessed the criminal activity at issue; and (5) the witness's information accurately predicts future activity.

*Elmore*, 548 F. App'x at 836 (quoting *Johnson*, 592 F.3d at 449). "Though these factors all are relevant to [the] analysis, no single factor is dispositive or even necessary to render an

---

4   As discussed in n.6, *infra*, the Court finds credible Detective Caterino's testimony that he knew Defendant went by the name "Streets" through previous investigations in the Braddock area, where Defendant resided; that Defendant utilized a tannish-gold Chevy Impala (which was registered to Defendant's father, Andre Dixon) because he had seen him driving it numerous times in Braddock, Swissvale and Homestead; and that although the Chevy Impala had tinted windows on both sides of the vehicle and the rear windshield, Detective Caterino was able to see Defendant through the front windshield or with the driver's window rolled down and when he exited the vehicle. (Docket No. 61 at 9-10, 19, 20-21).

informant's tip reliable." *Johnson*, 592 F.3d at 449.

Given the totality of the circumstances here, the Court finds that the information provided by the victim had "sufficient indicia of reliability . . . for us to conclude that the officers possessed an objectively reasonable suspicion" to justify stopping the vehicle. *Johnson*, 592 F.3d at 449. In a face-to-face meeting, the victim informed TFO Niebel that "Streets" sold him drugs, thus TFO Niebel could assess the victim's credibility and the victim could be held responsible if the information was untrue. To that end, nothing in the record suggests any bias by the victim. The victim provided a first-hand account of the drug transaction which had only recently occurred, including information that would not have been available to others.[5] Next, the victim drove with Detective Caterino and another agent to the area where the drug transaction occurred based on the victim's description of that location. (Docket No. 61 at 12). The victim's location information accurately predicted future activity for when they arrived, the victim saw the Chevy Impala and stated, "[t]hat's him right there," referring to the person who sold him the drugs. (*Id.* at 12-13, 21-22). Detective Caterino also immediately recognized the Chevy Impala and noted that the vehicle's windows were tinted and not possible to clearly see through, which is illegal in Pennsylvania. (*Id.* at 13). *See United States v. Meran*, Crim. No. 16-222, 2017 WL 4803927, at *7 (W.D. Pa. Oct. 23, 2017) (citing *United States v. Johnson*, 452 F. App'x 219, 225 (3d Cir. 2011) ("The police have reasonable suspicion justifying a traffic stop when a vehicle has dark tinted windows in violation of Pennsylvania law."). All told, the victim's tip, corroborated by

---

[5] The defense did not object to the admissibility of the officers' testimony about the information the victim relayed to them. Nonetheless, the Court notes that the Federal Rules of Evidence are not strictly applied at a suppression hearing. *See United States v. Brooks,* 341 F. Supp. 3d 566, 573 n.2 (W.D. Pa. 2018) (citations omitted) (collecting authority for the proposition that "[t]he rules of evidence do not apply in a suppression hearing."). Even if that were not the case, the officers' testimony concerning information provided by the victim is admissible because it is not hearsay and the Court finds that the testimony is reliable for the reasons discussed herein. *See United States v. Figaro*, 126 F. App'x 75, 77 (3d Cir. 2005) (officer's testimony regarding a witness's identification of the defendant was not hearsay because it was not offered to prove truth of matter asserted, but rather to explain how officer identified the defendant from evidence collected from stopped vehicle).

Detective Caterino's prior knowledge of Defendant, was sufficiently reliable to provide law enforcement with reasonable suspicion that Defendant was involved in drug trafficking, which was only further enhanced by Detective Caterino's observation about illegal window tint.

When the Chevy Impala began to move, Detective Caterino followed the vehicle and notified the Braddock Police Department to attempt to stop it and to identify the driver because of the ongoing overdose investigation.[6]  (Docket No. 61 at 13-14, 22-23).  Several police departments responded and stopped the vehicle on the Rankin Bridge, (*id.* at 14), which was justified because law enforcement had reasonable suspicion to do so for reasons just discussed. Detective Caterino drove by the scene and positioned his vehicle at a nearby gas station. (*Id.* at 14-15).  When the individuals were removed from the vehicle, Detective Caterino, using binoculars, immediately recognized Defendant as the driver.  (*Id.* at 15, 24). The victim, also using binoculars, positively identified Defendant as "Streets," who had provided him with the drugs. (*Id.*).  The victim's positive identification was sufficient to establish probable cause for Defendant's arrest.  *See Devenpeck*, 543 U.S. at 152 ("[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal

---

[6]   The Court is not persuaded by Defendant's contention that Detective Caterino's credibility is impeached because his written report demonstrates that he did not have corroborating information about the driver's identity, contrary to his testimony at the suppression hearing. (Docket No. 66, ¶ 5). According to the report, the victim identified the driver of the vehicle as "Streets," who sold him the heroin involved in his overdose and then further states, "[d]ue to the above information, investigators followed the . . . vehicle and requested the Braddock Police conduct a traffic stop in an attempt to identify the driver." (Docket Nos. 65, ¶¶ 13-14; 65-1 at 1; 66, ¶ 5). Defendant asserts that Detective Caterino would have included in the report prior corroborating information about the driver's identity if he had same, but he apparently did not. (Docket Nos. 65, ¶ 13; 73 at 14, 16). In this Court's estimation, the report's statement that Detective Caterino requested police to stop the vehicle to identify the driver does not contradict his hearing testimony that he knew Defendant as "Streets" and that he drove a tannish-gold Chevy Impala. Detective Caterino's statement in the report that he requested police to conduct a vehicle stop to identify the driver signifies that he wanted to verify that Defendant was the person driving the vehicle *at that time*. Although Defendant now claims that the report could have included additional corroborating information, the Court recognizes that police officers are not lawyers and their reports should not be judged by the same standard as legal pleadings. In sum, the Court finds that Detective Caterino credibly testified at the hearing concerning his prior knowledge of Defendant, and the report, as written, does not contradict his testimony. *See United States v. Conley*, 859 F. Supp. 830, 840 (W.D. Pa. 1994) ("The Court, as finder of fact, is free to accept or reject any part or all of any witness's testimony.").

offense has been or is being committed."); *Wilson v. Russo*, 212 F.3d 781, 790 (3d Cir. 2000) (a positive identification by a victim witness is usually sufficient, on its own, to establish probable cause).

Additionally, through radio contact with officers who conducted the stop, Detective Caterino knew that Defendant had provided an incorrect name based on prior investigations involving Defendant. (Docket No. 61 at 9, 15-16). Detective Caterino ran a check through NCIC, learned that Defendant was wanted on a probation violation warrant and relayed that information to the officers who conducted the vehicle stop. (*Id.* at 16, 24-25). The outstanding probation violation warrant also provided the police with probable cause to arrest Defendant. *See United States v. Venson*, Crim. No. 07-364, 2009 WL 1565736, at *9 (W.D. Pa. June 3, 2009) (citing *United States v. Roper*, 702 F.2d 984, 989 (11th Cir. 1983) (finding probable cause to arrest suspect where officer had radioed NCIC and learned of warrant for suspect's probation violation); *United States v. McDonald*, 606 F.2d 552, 553-54 (5th Cir. 1979) ("[T]he cases uniformly recognize that NCIC printouts are reliable enough to form the basis for the reasonable belief which is needed to establish probable cause for arrest")). For this reason and those already discussed, the stop of the vehicle driven by Defendant and his arrest were lawful under the Fourth Amendment.

### B. The Vehicle Search Was Lawful

The Court further finds that the warrantless search of the vehicle conducted by TFO Niebel at the scene of the stop and later when the vehicle was towed to the police station was lawful pursuant to the automobile exception. "The automobile exception to the warrant requirement permits law enforcement to seize and search an automobile without a warrant if 'probable cause exists to believe it contains contraband.'" *United States v. Burton*, 288 F.3d 91,

100 (3d Cir. 2002) (quoting *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996)). Moreover, "the automobile exception does not evaporate once the vehicle has been taken away from the place of the initial stop to the police station." *United States v. Thompson*, 545 F. App'x 167, 170-71 (3d Cir. 2013) (citing *Texas v. White*, 423 U.S. 67, 68 (1975) ("[P]olice officers with probable cause to search an automobile at the scene where it was stopped [can] constitutionally do so later at the station house without first obtaining a warrant. . . . [T]he probable-cause factor that developed at the scene still obtain[s] at the station house."); *California v. Acevedo*, 500 U.S. 565, 570 (1991) ("[I]f the police have probable cause to justify a warrantless seizure of an automobile on a public roadway, they may conduct either an immediate or a delayed search of the vehicle.")).

"If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *United States v. Ross*, 456 U.S. 798, 825 (1982). Probable cause exists when, viewing the totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. To that end, courts in this District have held that "evidence of a hidden compartment within a suspect's automobile can contribute to, and, under appropriate circumstances, may even single-handedly establish, a finding of probable cause." *Meran*,[7] 2017 WL 4803927, at *18 (quoting *United States v. Gooch*,[8] 915 F. Supp. 2d 690, 719

---

7   The court in *Meran* determined that the police officer's observation of an aftermarket square box under the rear bumper area of a van, which he knew was used to hide contraband based on his training and experience, in conjunction with other observations (such as dark window tint and travelling on a highway known as a major drug corridor) would lead a reasonable officer with similar training and experience to conclude that there was at least a fair probability that contraband would be found in the trap. *Meran*, 2017 WL 48039027, at *18. As such, the court found that there was probable cause to search the trap pursuant to the automobile exception. *Id.*

8   In *Gooch*, the court found that the police officer's observation of a loose liner in the trunk of a car would lead a reasonable officer with similar training and experience to conclude that the vehicle contained a hidden compartment. *Gooch*, 915 F. Supp. 2d at 721. The court concluded that evidence of the hidden compartment, in conjunction with the other factors present, would lead an objectively reasonable officer to determine that there was at least a fair probability that contraband would be found under the lining in the trunk. *Id.* Therefore, the court held that the officer's search of the area behind the trunk liner was lawful pursuant to the automobile exception. *Id.*

(W.D. Pa. 2012) (collecting decisions from the Fifth and Tenth Circuit Courts of Appeals that have so held)).

Given the victim's information that "Streets" sold him the drugs involved in the overdose and the victim's positive identification of Defendant as "Streets," TFO Niebel had reason to believe that there was a fair probability that contraband or evidence of a crime would be found in the vehicle. *See Gates*, 462 U.S. at 238. When TFO Niebel looked inside the vehicle at the scene, he noticed pry marks on the dashboard compartment.[9] (Docket No. 61 at 33-34, 38, 45). The pry marks caught TFO Niebel's attention because, based on his training and experience, they were in an area on the dashboard which is a known spot for drug dealers to hide drugs, weapons and money. (*Id.* at 34). TFO Niebel's observation of pry marks on an area known to be used for concealing contraband would lead a reasonable officer with similar training and experience to conclude that the vehicle had a hidden compartment which could contain drugs. *See Meran*, 2017 WL 48039027, at *18; *Gooch*, 915 F. Supp. 2d at 721. As such, the Court finds that evidence of the dashboard compartment, in conjunction with the victim's information that Defendant sold him the drugs involved in the overdose, would lead an objectively reasonable officer to determine that there was at least a fair probability that contraband would be found in the compartment. Accordingly, TFO Niebel's search of the vehicle, including opening the

---

[9] Defendant contends that TFO Niebel's credibility is impeached by the photographs entered in evidence at the suppression hearing. (Docket Nos. 59-2; 66, ¶ 6). According to Defendant, "[t]he pertinent photographs confirm, contrary to Mr. Niebel's say-so, that the condition of the [compartment] was in no manner suspect or 'fiddled with' prior to Mr. Niebel's warrantless act of removing [it]." (Docket No. 66, ¶ 6). On cross-examination, TFO Niebel agreed with defense counsel that the photographs about which he testified are not three-dimensional but rather flat and depicted something that would have depth. (Docket No. 61 at 39). To that end, TFO Niebel indicated that the area with the pry mark was depressed and not flush with the dashboard. (*Id.*). TFO Niebel testified that it "look[ed] like someone used a knife or a sharp object to wedge between the black and the tan of the dash." (*Id.*). The Court reviewed the photographs as TFO Niebel testified and recognizes that they are not three dimensional, which makes it difficult to discern the appearance and depth of the pry mark about which TFO Niebel testified. Nevertheless, given TFO Niebel's demeanor and manner on the stand and his ability to accurately recollect the matters about which he testified, the Court credits his testimony that he noticed pry marks on the dashboard compartment.

dashboard compartment at the scene to look inside and subsequently searching that area at the police station, did not violate the Fourth Amendment pursuant to the automobile exception. Consequently, any evidence seized as a result of the vehicle search, including the dashboard compartment, is admissible at the trial of this case.

### C. Defendant's Statements Are Admissible

Defendant contends that any statements he made during a custodial interrogation following his arrest were a by-product of the illegal stop and search of the vehicle and therefore must be suppressed as "fruit of the poisonous tree."[10] (Docket No. 51, ¶ 18). *See Wong Sun v. United States*, 371 U.S. 471, 488 (1963) (holding that evidence obtained as a direct result of an unconstitutional search or seizure is subject to exclusion). In view of the Court's holding that the stop and search of the vehicle were lawful, Defendant's subsequent statements to law enforcement are admissible at trial.

## IV. Conclusion

For the reasons discussed herein, Defendant's Motion to Suppress Evidence (Docket No. 51) is DENIED.

An appropriate Order follows.

*s/ Nora Barry Fischer*
Nora Barry Fischer
Senior United States District Judge

Date: April 24, 2020

cc/ecf: All counsel of record

---

[10] Defendant does not seek suppression of his statements on any other grounds.